UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| JEFF GRUBTILL, | ) | Civ.  05-5103-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND |
| | ) | REMANDING DECISION OF |
| JO ANNE B. BARNHART, | ) | COMMISSIONER |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Jeff Grubtill, moves the court for reversal of the Commissioner of Social Security's ("Commissioner") decision finding Grubtill was not entitled to disability insurance benefits under Title II of the Social Security Act. Defendant opposes the motion.  For the reasons discussed below, the court reverses and remands the Commissioner's decision.

**PROCEDURAL BACKGROUND**

Grubtill filed applications for disability insurance benefits and supplemental security income payments and alleged a disability onset date of February 17, 1997.  After a hearing (2002 Hearing), the ALJ issued a decision finding Grubtill was not disabled.  The Appeals Council denied Grubtill's request for review, and Grubtill filed a civil action in this court.[1]  On July 1,

---

[1] The prior action can be found at Civ. 02-5073-KES.  For clarity, all citations to the docket or the administrative record refer to Civ. 05-5103-KES unless explicitly stated otherwise.

2003, the court issued an order (2003 Order) reversing the ALJ's decision and remanding the case to the Commissioner.  A supplemental hearing (2004 Hearing) was held, and the ALJ issued a second opinion on February 22, 2005, finding Grubtill was not disabled before December 31, 2001, when Grubtill's disability insurance benefits coverage expired.[2]  Accordingly, the ALJ denied Grubtill's application for disability insurance benefits.  The Appeals Council denied Grubtill's request for review, and thus, the ALJ's decision is the "final decision" under 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

Grubtill was born on August 20, 1960.  He earned his GED.  From October of 1988 until March of 1997, Grubtill worked as a building maintenance engineer for a shopping mall in Omaha, Nebraska.  In March of 1996, Grubtill slipped and fell while at work, injuring his lower back and both wrists.  He went to the Methodist Hospital emergency room where x-rays were taken, which revealed no fractures.

On July 25, 1996, Grubtill went to the Omaha Orthopedic Clinic and Sports Medicine, P.C., where he was treated by David A. Clough, M.D. Dr. Clough prescribed a neutral right wrist splint, a 10-pound lifting

---

[2] The ALJ did find that Grubtill was disabled after August 20, 2003, and thus, was entitled to supplemental security income under Title XVI of the Social Security Act.  The parties do not dispute this finding.  Instead, the only issue before the court is the ALJ's finding that Grubtill was not disabled prior to December 31, 2001.

-2-

restriction, and ordered a bone scan and an MRI to further diagnose his wrist. On August 7, 1996, Dr. Clough noted that MRI and bone scan reports are consistent with Kienbock's disease, stage II.[3]

On October 4, 1996, Dr. Clough noted that Grubtill was having difficulty with extension and flexion of his right wrist with some aching, soreness, and some mild swelling.  Dr. Clough recommended that Grubtill keep his wrist splint on for work.

On November 15, 1996, Dr. Clough indicated that Grubtill had marked pain on flexion and extension beyond his stopping point on the right centered at the capitolunate articulation.  While the follow-up x-rays showed osteosclerosis of the lunate was completely resolved, there was still some lunate shortening, and the capitolunate joint was bone on bone.  Dr. Clough believed the majority of Grubtill's symptoms were coming from the capitolunate arthritis, which was likely aggravated by the Kienbock's disease. Dr. Clough changed Grubtill's medications and advised him that he may eventually need a capitolunate arthrodesis with Herbert screws to close the stiff joint.

---

[3] Kienbock's disease is "a condition causing the lunate (the small bone in the wrist) to collapse, which decreases movement of the wrist and causes great pain." Koshinski v. Decatur Foundry, Inc., 177 F.3d 599, 600 (7th Cir. 1999) (citing *The Kienbock Disease Information Center* at http://www. visitations.com/kienbock).

On December 27, 1996, Dr. Clough noted that Grubtill had no more tenderness on the right wrist.  He advised Grubtill to continue using the wrist splint for work, and was hopeful that when he next saw him, he could be released to full activities.  Dr. Clough cautioned him, however, that "the reperfussion stage that he is in now is also a high risk for injury as the dead bone is being removed, and the new bone has not yet been added."  AR 297.[4]

On February 12, 1997, while at work, Grubtill slipped and fell on a patch of ice.  After the fall he experienced pain in the left lower back radiating into the left lateral leg and into the calf with some arch cramping.  Grubtill also broke his right wrist splint during the fall.   Dr. Clough diagnosed a lumbar strain with no evidence of radiculopathy.  Grubtill was fitted with a new wrist split and his medication was switched from Oruvail to Indocin.

Grubtill eventually had to stop taking Indocin because of tinnitus and headaches.  Dr. Clough noted that Grubtill had increased leg pain radiating down his left leg to his left foot as well as tingling and cramps in his left foot.  Dr. Clough also noted that Grubtill had been walking with a cane and was unable to sit for long periods of time due to his back pain.

Grubtill quit working in March of 1997 because of his injuries.  On March 21, 1997, Dr. Clough reported that an MRI scan showed a left L5-S1

---

[4] All citations to "AR" refer to the appropriate page of the administrative record found at Docket 11.

herniated disk that looked like an extruded fragment in the lateral recess. Dr. Clough recommended a lumbar epidural steroid injection and noted that if Grubtill failed to improve after a couple injections, he would probably be a candidate for surgery.

On April 4, 1997, Dr. Belatti, M.D., administered a lumbar epidural steroid injection.

On April 25, 1997, Dr. Clough reported that Grubtill's first epidural injection provided a few hours of relief, but nothing long lasting.  Grubtill's right wrist range of motion was about half of normal in dorsi-flexion and palmar-flexion.  X-rays still showed the pre-existing capitolunate arthritis. Dr. Clough told Grubtill to wear his wrist brace only for heavy lifting activities and that he could only do sedentary work activities because of his back.

On May 9, 1997, Dr. Clough reported that Grubtill had had a sudden onset of left wrist swelling and pain three weeks prior.  Dr. Clough noted swelling on the dorsal aspect of the left wrist with considerable aching of the scapholunate ligament area.  X-rays showed a 5-millimeter widening of the scapholunate joint and a significant dorsal tilt of the lunates, suggesting an acute scapholunate ligament disruption.  Dr. Clough indicated that he wanted Grubtill to have an MRI of his left wrist, and that he would probably need a closed reduction and pinning of the scapholunate interval with twelve weeks

of thumb spica cast immobilization, followed by pin removal and gradual protected range of motion.

On May 27, 1997, Dr. Belatti performed a lumbar epidural steroid injection.

On June 11, 1997, Grubtill underwent surgery for correction of scapholunate dislocation.  Grubtill had a follow-up appointment with Dr. Clough on June 27, where he reported that his lumbar pain had improved after receiving the injection from Dr. Belatti.  His cast was replaced with a short arm thumb-spica cast.

On July 11, 1997, Dr. Clough noted that Grubtill was experiencing some discomfort in his right hand and recommended a different splint which would not allow radial and ulnar deviation.  Grubtill reported to Dr. Clough that his back pain resolved following his last lumbar epidural steroid injection in May, but his leg pain resurfaced.

On August 5, 1997, Dr. Belatti performed another lumbar epidural steroid injection at the L5-S1 level.

On August 27, 1997, Dr. Clough reviewed x-rays of Grubtill's wrist, which revealed capitolunate degenerative arthritis and collapse of the lunate. Dr. Clough noted that Grubtill would have to be splinted for any heavy activities and if he develops significant radioscaphoid or radiolunate degenerative arthritis, he may have to endure complete wrist infusion.

Dr. Clough indicated Grubtill still had some persistent low back pain, and if he has no improvement by mid-September, Dr. Clough would re-do his MRI scan and Grubtill would have to have a laminotomy and surgery to remove the extruded fragment shown on the March 1997 MRI.

On September 4, 1997, Dr. Clough attempted to remove one of the pins from Grubtill's left wrist, but was unable to find the end of the pin. Dr. Clough, therefore, scheduled to take the pin out while Grubtill was under anesthesia.

On September 12, 1997, an MRI of Grubtill's lumbar spine demonstrated slight loss of disc hydration and mild disc bulge at L5-S1.  On September 26, Grubtill was examined by Michael J. Morrison, M.D., at the recommendation of Dr. Clough.  Dr. Morrison believed that the September 12 MRI revealed some bulging of the disk at L5-S1 which was less prominent than the MRI performed on March 17, 1997.  Dr. Morrison diagnosed lumbar disk syndrome L5-S1 and recommended out-patient therapy and anti-inflammatory medication.

On October 6, 1997, Grubtill was referred by Dr. Morrison to Excel Physical Therapy.  On October 20, Dr. Morrison again diagnosed lumbar disk syndrome with left leg radiculopathy and recommended an out-patient myelogram with a possible post-myelogram CT scan.

On November 21, 1997, Dr. Morrison reported that Grubtill was still complaining of pain in his lower back with radiation into his left leg. Dr. Morrison noted that Grubtill had undergone a lumbar myelogram with a post-myelogram CT scan, both of which failed to reveal any significant disk herniation.  Dr. Morrison diagnosed a lumbar strain and recommended a vigorous effort at abdominal flank muscle strengthening exercises to his low back, utilization of nautilus equipment, walking, bicycling or swimming exercise, and anti-inflammatory medication.

On August 25, 1998, Grubtill had a follow-up appointment with Dr. Clough.  Grubtill reported he worked in a family-owned business.  X-rays of his right wrist demonstrated no change from previous x-rays.  Dr. Clough wrote a letter to Grubtill's worker's compensation insurance company describing his condition.  Dr. Clough noted continued dorsal discomfort over the lunate on the right wrist, indicating that he believed the majority of his symptoms were caused by the dorsal tilt to the lunate and the dorsal collapse of the lunate.

On September 3, 1998, Dr. Morrison again diagnosed lumbar strain and possible lumbar disc syndrome with left leg radiculopathy.   He recommended an EMG and nerve conduction study of Grubtill's lower leg.  On November 30, 1998, Dr. Morrison noted that Grubtill's EMG and nerve condition study of his left leg radiculopathy revealed some mild injury in the past to the L5 nerve

root.  Dr. Morrison again diagnosed lumbar strain and lumbar disc syndrome with left leg radiculopathy and suggested that Grubtill receive another MRI, which Grubtill received.

On December 23, 1998, Dr. Morrison noted that according to the MRI study, the nerve did not appear to be displaced or edematous.  Dr. Morrison prescribed physical exercises and anti-inflammatory medications.

On February 15, 1999, Dr. Clough reviewed Grubtill's x-rays and determined there were no changes in his right wrist.  Dr. Clough believed Grubtill was close to maximum medical improvement regarding his right wrist.

On July 13, 1999, Grubtill underwent a functional capacity evaluation by a physical therapist.  The evaluation demonstrated Grubtill was functioning at the light physical demand level and that he had the ability to lift 20 pounds occasionally, 10 pounds frequently, and sit and stand frequently during the day.

On December 2, 1999, Grubtill had another functional capacity evaluation performed by a physical therapist.  The functional capacity evaluation again placed him at light duty work.  After reviewing the evaluation, Dr. Morrison advised Grubtill to continue conservative treatment.

On January 25, 2000, Grubtill received another interlaminar lumbar epidural steroid injection from Dr. Belatti at the L5-S1 level.  Three days later, Dr. Clough noted that Grubtill had good improvement from his injection, and

it had taken the edge off of his foot pain.  Dr. Belatti gave Grubtill another steroid injection on April 4, 2000.

On May 8, 2000, Dr. Dale Anderson, an orthopedic surgeon, examined Grubtill.  Dr. Anderson noted that if Grubtill went without his wrist splint, pain and swelling and limited use of the hand occurred.  Dr. Anderson reviewed an x-ray of Grubtill's right wrist, which showed evidence of capitolunate arthritis and a loss of all articular cartilage and definite sclerotic or increased density between the two wrist bones.  Dr. Anderson believed that it was the cause of pain and discomfort.  Dr. Anderson recommended fusion of the capitolunate joint that probably would diminish his pain and discomfort.  Dr. Anderson was not optimistic that surgery and fusion would eliminate all of his symptoms, however.

On September 5, 2000, Steven Frost, M.D., saw Grubtill on referral from Dr. Belatti.  Dr. Frost noted Grubtill had a history of low back pain with left leg pain worse than his right leg pain in the L5 distribution, and a history of injections giving only minimal relief.  Dr. Frost assessed degenerative joint disease of the lumbar spine, bilateral radiculitis, and bilateral wrist pain.

On September 19, 2000, a state agency medical consultant reviewed Grubtill's medical records and completed a Physical Residual Functional Capacity Assessment.  The consultant determined Grubtill could lift 20

pounds occasionally and 10 pounds frequently; sit/stand for about six hours in an eight-hour workday; and had unlimited ability for pushing and pulling.

On October 16, 2000, Grubtill saw Dr. Frost, where he reported that he had been non-compliant with his Neurontin and had been using Vicodin very sparingly, as he was afraid of the side effects of both drugs.  Dr. Frost proceeded with an epidural steroid injection.

On July 10, 2001, Grubtill was seen by Craig G. Hansen, M.D., at Creekside Family Practice.  Dr. Hansen indicated that Grubtill reported that his left foot "spasmed into a plantar flexion" when he stepped out of his van while selling t-shirts in Missouri.  AR 593.

On November 8, 2001, Dr. Anderson completed a Medical Assessment of Ability to do Work-Related Activities.  He opined that Grubtill could only lift/carry 10 to 15 pounds.  Dr. Anderson noted that "wrist arthritis causes pain with strong grasp and lifting," and that Grubtill "complains of chronic back pain that limits activity."  AR 345.

On November 29, Dr. Frost saw Grubtill again.  Grubtill complained that his left leg was "on fire" and his right leg had a cramp-like pain from thigh to calf.  On December 31, 2001, Dr. Frost opined that Grubtill:

> would have a difficult time working . . . a full time job, eight hours a day, five days a week . . . . The reason being that his increased pain, not only in his back and legs, but also in his wrists and arms, would exaggerate his pain syndrome . . . . [I]t would have to be part of Mr. Grubtill's daily activities to be able to lie down when need be, or recline on a daily basis.

-11-

Dr. Lecy, a chiropractor whom Grubtill saw from March of 2000 until February 12, 2002, reviewed Dr. Frost's report dated December 31, 2001, and Grubtill's records.  On February 23, 2002, Dr. Lecy opined within a reasonable degree of medical certainty that Grubtill has a permanent impairment which makes him incapable of working an eight-hour day, five days a week.

Grubtill applied for disability insurance benefits on June 8, 2000, claiming he had been disabled since February 17, 1997.  Following the 2002 Hearing, the ALJ denied Grubtill's application for disability benefits.

Additional medical evidence was submitted for consideration on remand.  On October 4, 2002, Grubtill was treated in the emergency room at Rapid City Regional Hospital for left foot or heel pain.  Grubtill reported sitting in a chair when he experienced sudden onset of pain.

On October 5, 2004, Grubtill was treated in the emergency room at the Custer Community Hospital for severe left heel pain.  He was diagnosed with "heel pain consistent with Achilles bursitis."  AR 616.

On October 7, 2002, Grubtill indicated continued problems with his left ankle and Achilles tendon.  Grubtill reported being treated at the Rapid City urgent care clinic and at the Custer hospital for the condition.

On December 26, 2002, Grubtill was treated in the emergency room at the Custer Community Hospital for pain in his left Achilles heel.  Grubtill

-12-

reported playing with his kids and his heel locked up.  Grubtill was prescribed Demerol for pain.

On January 1, 2003, Grubtill was seen by Dr. Anderson.  Grubtill complained that his left ankle had gotten caught or locked "in a plantar flexed position" four times over the previous eight months.  AR 545.  Grubtill reported being treated at the emergency room for this condition. Dr. Anderson recommended an MRI to determine the cause of the Grubtill's problem.  After obtaining the MRI results, Dr. Anderson recommended that Grubtill ride a stationary bike to lubricate the joint.

On March 12, 2003, Grubtill reported to Dr. Frost that he was experiencing left foot pain, and that his left foot would become locked.

On April 21, 2003, Grubtill was seen at Creekside Family Practice by Kathryn Putnam, PA-C.  Grubtill reported being involved in a car accident eight days before.  Grubtill reports being evaluated at the emergency room following the accident.

On August 20, 2003, Dr. Anderson saw Grubtill again.  Grubtill indicated that he was in a car accident shortly before Easter.  As a result of the accident, Grubtill injured his back and experienced increased pain in both wrists.

On January 1, 2004, Grubtill reported increased lower back pain after hauling fire wood.  Grubtill indicated that he could only sleep four to five

hours per day, and that he was taking one to two doses of Hydrocodone along with two to three doses of ibuprofen per day.

Craig G. Mills, M.D. examined Grubtill on September 20, 2004.   AR 621-29.  Dr. Mills listed Grubtill's capabilities for lifting, carrying, sitting, standing, walking, as well as his ability to utilize his hands and feet.  Dr. Mills concluded: "The patient's ability to perform work related activities on a full-time basis, that is 5 days per week, 8 hours per day, or 40 hours per week is highly unlikely due to fluctuating levels of pain and dysfunction in the back, legs, hands, and wrists."  AR 624.

## ALJ DECISION

On February 22, 2005, Administrative Law Judge (ALJ) James W. Olson issued a decision[5] denying Grubtill's application for disability insurance benefits.  The ALJ used the sequential five-step evaluation process.[6]  At the

---

[5] For clarity, all references to the ALJ's decision refer to the February 22, 2005, decision unless explicitly stated otherwise.

[6] The five-step sequential analysis as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  See Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

first step, the ALJ found that Grubtill had not engaged in substantial gainful activity since August 20, 2003.  At step two, the ALJ found that Grubtill suffers from status-post closed reduction and pinning of the left wrist scapholunate joint, Keinbock's disease, stage II, lumbar disc syndrome, and degenerative joint disease, all of which the ALJ considered to be "severe" under the Social Security Regulations ("Regulations").  At step three, the ALJ found that none of these impairments were of listing severity.  At step four, the ALJ found that prior to August 20, 2003, Grubtill retained the residual functional capacity (RFC) to perform his past relevant work as a voice representative technician.  Thus, the ALJ terminated the sequential evaluation process at step four and found that Grubtill was not disabled before December 31, 2001, when his disability insurance coverage expired.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if it is supported by substantial evidence in the record as a whole.  See 42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion.  See Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006); see also McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Review by this court extends beyond a limited search for

the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  See Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006); Craig v. Apfel, 212 F.3d 433, 435 (8th Cir. 2000).

The court's role under section 405(g) is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to re-weigh the evidence.  See Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  Furthermore, a reviewing court may not reverse the Commissioner's decision "'merely because substantial evidence would have supported an opposite decision.'" Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)); see also Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004).  The court must review the Commissioner's decision to determine if an error of law has been committed.  See Olson ex rel. Estate of Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).  Issues of law are reviewed de novo with deference given to the Commissioner's construction of the Social Security Act.  See Smith, 982 F.2d at 311; see also Olson ex rel. Estate of Olson, 170 F.3d at 824.  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision

of the ALJ even if the court would have decided it differently.  See Baker, 457 F.3d at 892.

### DISCUSSION

Grubtill argues the ALJ made two reversible errors: first, that the ALJ erred in disregarding Dr. Frost's opinion that Grubtill needed to lie down or recline throughout the day; and second, that the ALJ erred in finding Grubtill's subjective complaints of pain were not credible.

### I.    Dr. Frost

Grubtill argues that the ALJ erred in discounting the opinion of Dr. Frost, a treating physician.  Specifically, Grubtill argues that his RFC should have included Dr. Frost's opinion that "it would have to be part of Mr. Grubtill's daily activities to be able to lie down when need be, or recline on a daily basis." AR 347.  Defendant responds by contending the ALJ properly attributed no weight to Dr. Frost's opinion.

Treating physicians' medical opinions regarding their patients diagnoses, symptoms, and limitations often carry considerable weight.  See Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005).  "Generally, '[a] treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (quoting Hogan v. Apfel, 239 F.3d

958, 961 (8th Cir. 2001)) (alteration in original); <u>see also</u> 20 C.F.R.

§ 404.1527(d)(2).  Not every opinion by a treating physician deserves

controlling weight, however.  <u>See</u> <u>Hogan</u>, 239 F.3d at 961.  "The ALJ may

discount or disregard such an opinion if other medical assessments are

supported by superior medical evidence, or if the treating physician has

offered inconsistent opinions."  <u>Id.</u>  Regardless, the regulations require the

ALJ to "'always give good reasons'" for the weight given to a treating

physician's opinion.  <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1013 (8th Cir. 2000)

(quoting 20 C.F.R. § 404.1527(d)(2)).

Here, the ALJ stated several reasons for disregarding Dr. Frost's opinion

that Grubtill would need to lie down or recline throughout the day.  First, the

ALJ indicated that Dr. Frost treated Grubtill for his wrist problems rather

than back pain.  In doing so, the ALJ suggests that Dr. Frost does not qualify

for treating physician status as it relates to Grubtill's back problems.  The

court disagrees.  Dr. Frost treated Grubtill several times for back pain.  AR

325-31, 390-414.  Dr. Frost prescribed Grubtill zunaflex, vicoden, topimax,

lidoderm patches, and neuortin for his back problems.  Dr. Frost also

recommended an epidural steroid injection to alleviate Grubtill's back pain.

AR 404.  After considering the record as whole, the court finds that Dr. Frost

treated Grubtill for his back problems.  Dr. Frost thus qualifies as a treating

physician, <u>see</u> 20 C.F.R. § 404.1527(d)(2), and the ALJ must provide good reasons for discounting his opinion.

Second, the ALJ noted that Dr. Frost agreed with the results of the functional capacity assessment by Nano Johnson.  The ALJ then noted that there was no indication that Johnson's functional capacity assessment included a requirement that Grubtill be able to lie down or recline.  Presumably, the ALJ was suggesting that Dr. Frost's opinions were internally inconsistent.  <u>See</u> <u>Choate v. Barnhart</u>, 457 F.3d 865, 869 (8th Cir. 2006) (stating inconsistent opinions by a treating physician provides grounds for discounting that treating physician's opinion).  Neither the court, nor the ALJ, can determine, however, whether Dr. Frost's opinions were in fact inconsistent because the administrative record does not contain a copy of Johnson's functional capacity assessment.  Thus, it is impossible to know whether Johnson indicated that Grubtill's back pain requires him to lie down or recline throughout the day.

Third, the ALJ stated that he would not include a lie down requirement in Grubtill's RFC because Dr. Frost indicated that Grubtill would need to lie down "<u>or recline</u>," which in turn indicated that Grubtill did not need to lie down.  AR 33 (emphasis in original).  The ALJ also noted that Grubtill failed to provide "any measurable criteria involving reclining."  Once again, the court presumes that the ALJ was attempting to indicate an internal inconsistency

within Dr. Frost's opinion.  This attempt fails, however, because "recline" and "lie down" mean virtually the same thing.  <u>See</u> The Oxford English Dictionary Online Dictionary (2d ed 1989) (defining recline as "to lay down, or make to lie down").  Rather than a true inconsistency, the ALJ merely pointed out a distinction without a difference.  Accordingly, the fact that Dr. Frost qualified Grubtill's lie down requirement by stating that reclining is sufficient does not provide a good reason for discrediting Dr. Frost's opinion.

Fourth, the ALJ noted that Dr. Frost indicated that he does not perform disability determinations.  The court finds that this has no effect on Dr. Frost's ability to opine that Grubtill's symptoms require the patient to lie down or recline throughout the day, however.  Dr. Frost, as a treating physician, is simply offering a medical opinion regarding his patient's symptoms and physical limitations.  <u>See</u> 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians . . . that reflect judgments about the nature and severity of your impairments, including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions."); <u>cf.</u> <u>Douglas v. Barnhart</u>, No. 04-2530, 2005 WL 600664, at *1 (8th Cir. March 16, 2005) (unpublished) (stating Dr. Frost's review of and agreement with a functional capacity assessment performed by a physical therapist was substantial evidence to support ALJ's RFC).

-20-

Fifth, the ALJ stated that Dr. Frost specializes in pain management rather than orthopedic and rehabilitative medicine.  Although a treating physician's opinion regarding an area outside the physician's expertise carries less weight, see Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000), the court finds that Grubtill's need to lie down or recline to alleviate his back pain is within Dr. Frost's area of expertise.  As a pain specialist who treated Grubtill for back pain, Dr. Frost logically would have an opinion on how Grubtill's pain will limit his activities.  See Rush v. Barnhart, 432 F. Supp. 2d 969, 999 (D.N.D. 2006) (crediting pain specialist's opinion that claimant would need to "rest a lot during the day"); Selk v. Barnhart, 234 F. Supp. 2d 1006, 1010-14 (S.D. Iowa 2002) (crediting pain specialist's opinion regarding claimant's physical limitations).

Sixth, the ALJ indicated that Dr. Frost's opinion was inconsistent with the functional capacity evaluation performed by a physical therapist in this case.  AR 29, 195.  As the court stated in its 2003 Order, however, opinions from physical therapists are not "medical opinions from "'acceptable medical sources.'"  20 C.F.R. § 404.1527; 20 C.F.R. § 404.1513.  Thus, this functional capacity assessment does not provide a good reason for disregarding Dr. Frost's opinion that Grubtill will need to lie down or recline throughout the day.

In sum, although the ALJ stated several reasons for disregarding Dr. Frost's opinion that Grubtill will need to lie down or recline, none of these reasons show that Dr. Frost's opinions are inconsistent with the evidence as a whole, or that other medical assessments are supported by superior medical evidence.  The court thus finds that none of the ALJ's reasons constitute good reasons for disregarding Dr. Frost's opinions.  See Hogan, 239 F.3d at 961.  Accordingly, the court must once again remand this case to the ALJ to determine the weight attributable to Dr. Frost's opinion.

## II.    Grubtill's Credibility

Grubtill also argues that the ALJ erred in finding that Grubtill's complaints of pain were not credible.  In response, defendant argues that the ALJ's credibility determination is supported by substantial evidence in the record as a whole.

The ALJ determines the weight attributable to a claimant's subjective complaints, including pain, according to the framework created in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Five Polaksi factors guide the ALJ's credibility determination:  "1) the claimant's daily activities; 2) the duration, frequency, and intensity of the pain; 3) the dosage, effectiveness, and side effects of medication; 4) precipitating and aggravating factors; and 5)

functional restrictions." <u>Choate</u>, 457 F.3d at 871.[7]  The ALJ need not

mechanically discuss each of the <u>Polaski</u> factors.  <u>See</u> <u>Goff v. Barnhart</u>, 421

F.3d 785, 791 (8th Cir. 2005).  Although the ALJ can discount a claimant's

subjective complaints for inconsistencies with the record as a whole, "the ALJ

must make express credibility findings and explain the record inconsistencies

that support those findings." <u>Dolph v. Barnhart</u>, 308 F.3d 876, 879 (8th Cir.

2002).  If adequately explained and supported by the record the court will not

disturb an ALJ's credibility determination.  <u>See</u> <u>Dukes v. Barnhart</u>, 436 F.3d

923, 927 (8th Cir. 2006).

Here, the ALJ found that Grubtill's statements regarding his pain were

not credible "in light of inconsistencies between his statements and the notes

and opinions of treating physicians." AR 30.  Grubtill argues that this finding

was not supported by substantial evidence of the record as a whole.

First, the ALJ stated that there were no medical records supporting

Grubtill's testimony during the 2004 Hearing that he frequently visited an

emergency room to treat spasms in his left leg and his Achilles tendon.  AR

30.  Contrary to the ALJ's assertion, however, the administrative record does

in fact contain a multitude of medical records indicating that Grubtill sought

---

[7] The ALJ's opinion, relying on case law from the Tenth Circuit, lists
several additional factors.  AR 25.  Although academically stimulating, the
court notes that Eighth Circuit case law governs this case.  Thus, the court
refrains from considering these additional factors and follows the Eighth
Circuit's directive in <u>Polaski</u> and its progeny.

treatment for his left leg and Achilles heal, including treatment at the emergency room.   AR 542, 545, 552, 566, 593, 595, 604, 613, 614, 616. Accordingly, this finding by the ALJ is not supported by substantial evidence and does not provide a basis for discrediting Grubtill's subjective complaints.

Second, the ALJ found that Grubtill's testimony regarding his dosage of Hydrocodone conflicted with the medical evidence.  Grubtill testified at the 2004 Hearing that his Hydrocodone medication had been increased since the last hearing and that he had now started taking 7.5 milligrams Hydrocodone with 500 milligrams acetaminophen twice a day rather than once a day.  AR 635.  Citing an update form discussing Grubtill's medical treatment, medications, and work history that was completed just two weeks prior to the hearing, the ALJ found that Grubtill had not increased his dosage of Hydrocodone since the 2002 Hearing.  AR 31.  On the form, Grubtill listed the medications that he was presently taking and their dosages as "1-3" doses of Hydrocodone.  AR 539.  The information on the form is not inconsistent with Grubtill's testimony at the 2004 hearing that his Hydrocodone usage had increased since 2002.

The medication form that Grubtill completed prior to his 2002 Hearing indicated that he was taking 7.5 milligrams of Hydrocodone nightly at bedtime or as needed.  AR 141, 144.  Accordingly, the ALJ's finding that Grubtill

testified inconsistently regarding his use of Hydrocodone is not supported by substantial evidence in the record as whole.

Third, the ALJ found that Grubtill's lack of use of prescription pain medication weighs against crediting Grubtill's subjective complaints.  The ALJ asserted this exact same reason in his first ruling.  The court explicitly rejected this reason in its 2003 Order, and the court rejects it again for the same reasons previously stated.  The records indicate Grubtill took substantial amounts of prescription pain medication including Hydrocodone, Zanaflex, Lidoderm pathces, and ibuprofen.  Grubtill also received five epidural injections to block his pain.

Fourth, the ALJ discredits Grubtill's subjective complaints of pain based upon his work activity.  As the court noted in its 2003 Order, however, Grubtill's limited, part-time work for two months was not inconsistent with disability.  Thus, for the reasons stated in its 2003 Order, the court once again rejects this reason for disregarding Grubtill's subjective complaints of pain.

Fifth, the ALJ noted that Grubtill failed to comply with doctors' recommendation that Grubtill "pursue a vigorous effort at abdominal flank muscle strengthening exercises to his lower back."  The ALJ made this exact same finding in his prior decision.  In its 2003 Order, the court found that the ALJ never asked Grubtill whether he did exercise at home, and that the ALJ's

findings were not supported by substantial evidence in the record as a whole. On remand, the ALJ did a better job of identifying evidence that supports his finding that Grubtill did not engage in muscle strengthening exercises, and the court finds that this finding is supported by substantial evidence in the record as whole.

Sixth, the ALJ discredited Grubtill's subjective complaints for making inconsistent statements relating to Grubtill's disability. The ALJ suggested that Grubtill made inconsistent statements regarding his success from physical therapy, and that Grubtill self limited during two functional capacity examinations. The ALJ asserted this exact reasoning in his previous decision and the court rejected it in the 2003 Order. Thus, the court again rejects these reasons for discrediting Grubtill's testimony.

Finally, the ALJ indicates that Grubtill's subjective complaints of pain were not supported by the diagnostic testing, which indicate "mild to very mild injury to the left L5 nerve root, with no gross muscle weakness in either lower extremity." AR 32. Again, the ALJ asserted this basis for rejecting Grubtill's testimony in the ALJ's first order, and the court, at least implicitly, rejected this basis when the court found the ALJ erred in discounting Grubtill's subjective complaints of pain. Further, when considered in conjunction with the extensive medical treatment Grubtill obtained for his back condition, this one diagnostic test does not provide substantial evidence to support

-26-

discrediting Grubtill's subjective complaints of pain.  Other tests indicated a bulging disc and mild degenerative disc disease, AR 174-75, and Grubtill used considerable amounts of prescription pain medication and received at least five epidural steroid injections to treat his back condition.

In sum, the court again finds that the ALJ erred in discounting Grubtill's subjective complaints.  Although Grubtill's failure to exercise weighs against crediting his complaints, when considered in conjunction with the other evidence of Grubtill's pain, and in particular the repeated prescriptions to Grubtill of pain medication, this one fact does not provide substantial evidence to support the ALJ's decision to discredit Grubtill's subjective complaints of pain.  See Goff, 421 F.3d at 785 (stating that the ALJ can discount subjective complaints for "inconsistencies in the evidence as a whole") (emphasis added).  Thus, on remand, the ALJ should reevaluate the weight attributable to Grubtill's subjective complaints of pain.

## CONCLUSION

Because the court finds that the ALJ erred in discounting both Dr. Frost's opinions and Grubtill's subjective complaints of pain, the court must determine the proper remedy.  Grubtill argues that the court should award benefits rather than remanding for further proceedings.  Specifically, Grubtill argues that the ALJ ignored the 2003 Order and will likely ignore this order as well.  Although the court is troubled by the ALJ's apparent disregard

-27-

for the 2003 Order, the court refuses to award benefits solely for this reason. Instead, the court finds that the potential for awarding Grubtill his attorneys' fees under the Equal Access to Justice Act will provide sufficient deterrent to prevent continued disregard for the court's decisions.

The court refrains from awarding benefits at this time because the court cannot determine from the administrative record whether Grubtill's physical limitations, when properly determined, prevent him from performing either his past relevant work or another job that exists in a substantial number in the national economy.  Thus, the court remands for further proceedings.

Based on the foregoing, it is hereby

ORDERED that this case is remanded to the Commissioner in accordance with 42 U.S.C. § 405(g).

Dated October 2, 2006.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

-28-